**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

<table>
<tr><td>

SCHOENECKERS, INC. d/b/a BI
WORLDWIDE,

       *Plaintiff,*

   v.

KOBIE MARKETING, INC.,

       *Defendant.*

</td><td>

**Case No. 1:25-cv-01263-JDW**

</td></tr>
</table>

**MEMORANDUM**

Human ingenuity being what it is, people often find new ways to use tools. But patent law doesn't protect new uses of existing tools; it requires an invention. This line is relatively easy to understand in the context of physical tools. I could get a patent if I invent a screwdriver, but not if I am the first person to come up with the idea of using it as a lever or a chisel. Computers are tools, but sometimes the line between a new invention and a new use is harder to define. But that doesn't mean the principle doesn't apply. I can get a patent on a new computer component that I invent that was unknown in the prior art. I also might be able to get a patent if I assemble the components of a computer in a new way that, in effect, creates a new computer system. But I can't get a patent on a novel use of a computer to generate a different, previously unknown result.

That distinction between a new technology or a new use of a computer is the issue in this case. Schoeneckers, Inc. d/b/a BI Worldwide developed patents for an incentive application for website owners and a corresponding platform that makes use of the patented technology, launching the gamification industry. In this case, BI Worldwide contends that certain competitors, like Kobie Marketing, Inc., infringe three of those patents. But two of them are not patent eligible under 35 U.S.C. § 101, so I will grant Kobie's motion to dismiss BI Worldwide's infringement claims as to those patents.

## I.    BACKGROUND

BI Worldwide owns various patents, including U.S. Patent Nos. 8,768,764 (the "764 Patent"); 11,501,339 (the "'339 Patent"); and 9,779,421 (the "'421 Patent"), (together the "Patents-In-Suit"), all titled "Method And System For Embedding A Portable And Customizable Incentive Application On A Website." BI Worldwide operates the Bunchball Nitro platform which offers "an incentive application that is portable onto multiple websites and customizable on each site." (D.I. at 1 at ¶ 8.) The platform "has become the leader in enterprise gamification platforms." (*Id.* at ¶ 9.)

Relevant here, Claim 10 of the '764 Patent ("Claim 10") claims:

A method comprising:

> providing an incentive application from a network site over a data network to a first Web site and a second Web site, wherein the network site is operating on a computer system and wherein the first and second Web sites are operating on different computer systems, the incentive application to be embedded in the first Web site and the second Web site, respectively;

receiving and storing, at the network site, activity information of a first viewer from a provider of the first Web site, the activity information of the first viewer indicating the first viewer's involvement with the first Web site;

awarding, by the computing system, incentive information to the first viewer based on the activity information of the first viewer;

providing, using the incentive application at the first Web site, the first incentive information awarded to the first viewer when the first viewer returns to visit the first Web site, the incentive information awarded to the first viewer to incentivize additional activity of the first viewer with the first Web site;

receiving, at the network site, activity information of a second viewer from a provider of the second Web site, the activity information of the second viewer indicating the second viewer's involvement with the second Web site;

awarding incentive information to the second viewer based on the activity information of the second viewer; and

providing, using the incentive application at the second Web site, the second incentive information awarded to the second viewer when the second viewer returns to visit the second Web site, the incentive information awarded to the second viewer to incentivize additional activity of the second viewer with the second Web site.

('764 Patent at 12:19-52.)[1]

On October 15, 2025, BI Worldwide filed suit against Kobie, alleging that Kobie infringes one or more claims of the Patents-In-Suit by making, using, selling, offering to sell, or importing its Kobie Alchemy Loyalty Cloud platform in the United States.

---

[1]     The '764 Patent appears on the docket at D.I. 1-1, Ex. A, and D.I. 10-1, Ex. 1.

According to BI Worldwide, Kobie's platform competes with Bunchball Nitro as "a gamification platform that incentivizes customers to use [Kobie's] clients' websites." (D.I. 1 at ¶ 10.) On February 6, 2026, Kobie moved to dismiss each of the Patents-In-Suit as invalid under 35 U.S.C. § 101. BI Worldwide opposes the motion, which is ripe for review.

## II.     LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) allows a party to move to dismiss a complaint for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). Rather than require detailed pleadings, the "[r]ules demand only a short and plain statement of the claim showing that the pleader is entitled to relief[.]" *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (quotation omitted).[2] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* In determining whether a claim is plausible, the court must "draw on its judicial experience and common sense." *Id.* at 786–87 (same). First, the court must identify the elements needed to set forth a particular claim. *See id.* at 787. Second, the court should identify conclusory allegations, such as legal conclusions, that are not entitled to the presumption of truth. *See id.* Third, with respect to well-pleaded factual allegations, the court should accept those allegations as true and "determine whether they plausibly give rise to an entitlement to

---

[2]     Applicable regional circuit law governs the standard for motions to dismiss. *See Mobile Acuity Ltd. v. Blippar Ltd.*, 110 F.4th 1280, 1288 (Fed. Cir. 2024).

relief." *Id.* (quotation omitted). The court must "construe those truths in the light most favorable to the plaintiff, and then draw all reasonable inferences from them." *Id.* at 790 (citation omitted).

## III. ANALYSIS

### A. Representativeness

A district court may "limit[] the analysis of a § 101 challenge to representative claims … when the claims at issue are 'substantially similar and linked to the same' ineligible concept." *Mobile Acuity Ltd. v. Blippar Ltd.*, 110 F.4th 1280, 1290 (Fed. Cir. 2024) (quotation omitted). Kobie bears the initial burden to make that *prima facie* showing. *See id.* If Kobie makes the requisite showing, then the burden shifts to BI Worldwide "to present non-frivolous arguments as to why the eligibility of the identified representative claim cannot fairly be treated as decisive of the eligibility of all claims in the group." *Id.*

Kobie has made a *prima facie* showing that Claim 10 of the '764 Patent is representative of the remaining claims in that patent and the claims in the other Patents-In-Suit.[3] All of the patents are linked to the same concept of using an incentive application to award incentives to website visitors, and they share a common specification, which "is

---

[3]     However, as I've noted before, I am not convinced that a patentee's use of certain claims as exemplars in a complaint for infringement purposes is compelling evidence of representativeness because "[a] statement that a claim is representative for purposes of infringement—without more—is insufficient to show that a claim is representative for purposes of invalidity under 35 U.S.C. § 101." *ImagineAR, Inc. v. Niantic, Inc.*, No. 24-cv-1252, 2025 WL 2592261, at *5 n.3 (D. Del. Sept. 8, 2025) (quoting *GREE, Inc. v. Supercell Oy*, No. 19-cv-161, 2020 WL 475443, at *3 (E.D. Tex. Jan. 29, 2020)).

some additional indication of representativeness[.]" *PPS Data, LLC v. Jack Henry & Assocs., Inc.*, 404 F. Supp. 3d 1021, 1035 (E.D. Tex. 2019). It is no surprise, then, that the claims are substantially similar. (*See* D.I. 10-1, Ex. 7.) Though the claims contain minor differences, those differences do not alter the patents' overall focus.

However, BI Worldwide has met its burden to explain why Claim 10's eligibility should not be treated as decisive of the '421 Patent's eligibility. Claim 1 of the '421 Patent recites a system comprising, inter alia:

> An incentive application storage configured to receive and store activity information of a first viewer from a first website of a first provider, the activity information of the first viewer indicating the first viewer's involvement with the first website, and to receive and store activity information of a second viewer from a second website of a second provider, the activity information of the second viewer indicating the second viewer's involvement with the second website, the activity information of the first viewer received from the first website using an application programming interface (API) operable by the hardware processor, and the activity information of the second viewer received from the second website using the API operable by the hardware processor[.]

('421 Patent at 11:41-55.)[4]

During patent prosecution, the examiner determined that Claim 1 of the '421 Patent "use[s] a unique arrangement of a network of API's [sic] embedded into independent websites ... to collect and display incentive data particular to viewers" of those websites, and that the arrangement of APIs does not require the website provider

---

[4]    The '421 Patent appears on the docket at D.I. 1-1, Ex. B and D.I. 10-1, Ex.2.

6

to be involved with the incentive program in any manner.[5] (D.I. 14-1 at Page 91 of 275.) Though APIs might be conventional computing technology, the patent examiner's findings as to Claim 1 make it plausible that the '421 Patent's *arrangement* and *use* of APIs might not have been well-understood, routine, or conventional.[6] Thus, this particular claim element might supply an inventive concept for purposes of Section 101, so I will not treat Claim 10 as representative of the claims in the '421 Patent.

Aside from the '421 Patent, however, BI Worldwide has not met its burden to explain why Claim 10 is not representative of the remaining claims in the '764 and '339 Patents. As an initial matter, BI Worldwide's conclusory statement that "[t]here are many differences between each of the claims of the Asserted Patents" is not a "meaningful argument for the distinctive significance of any claim limitations not found in" Claim 10. *Mobile Acuity*, 110 F.4th at 1290 (quotation omitted).

BI Worldwide's arguments as to specific claims also fall short. Even if Claims 11-14 and 22 of the '339 Patent "include additional language that emphasizes the Asserted Patents' innovation of the incentive applications being customizable" (D.I. 14 at 190), BI

---

[5]   In undertaking a Section 101 analysis at the motion to dismiss stage, courts may consult the patent's prosecution history. *See CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1372–73 (Fed. Cir. 2020); *see also Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999, 1008 n.2 (Fed. Cir. 2018) (relying on prosecution history as matter of public record when reviewing motion for judgment on the pleadings). Indeed, Kobie has not challenged BI Worldwide's reliance on the prosecution history in opposing its motion to dismiss.

[6]   "The question of whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018).

7

Worldwide does not explain how that alleged emphasis has any bearing on the Section 101 analysis. It is not my job to guess or make arguments on BI Worldwide's behalf. *See Nokia Techs. Oy v. Warner Bros. Ent. Inc.*, No. 25-cv1337, --- F.Supp.3d ----, 2026 WL 622650, at *4 (D. Del. Mar. 5, 2026). Thus, I will treat Claim 10 as representative of the remaining claims of the '764 Patent and the claims of the '339 Patent.

### B.   Patent Eligibility

An invention is patent eligible if it claims a "new and useful process, machine, manufacture, or composition of matter." 35 U.S.C. § 101. "The Supreme Court has interpreted this language to exclude '[l]aws of nature, natural phenomena, and abstract ideas' from patent eligibility." *Recentive Analytics, Inc. v. Fox Corp.*, 134 F.4th 1205, 1211 (Fed. Cir. 2025) (quotation omitted). Following the Supreme Court's decision in *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208 (2014), "courts perform a two-step analysis to determine patent eligibility under § 101." *Recentive*, 134 F.4th at 1211. First, the court "determine[s] whether the claims at issue are directed to one of those patent-ineligible concepts." *Id.* (quotation omitted). If so, the court must "assess the 'elements of each claim both individually and as an ordered combination' to determine whether they possess an 'inventive concept' that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Id.* (same).

Patent validity under Section 101 is a question of law that can be resolved on a motion to dismiss. *Callwave Commc'ns, LLC v. AT & T Mobility*, 207 F. Supp. 3d 405, 410

(D. Del. 2016). Patents are presumptively valid, and "[t]he burden to prove the ineligibility of any patent claim stays with the patent challenger at all times." *Mobile Acuity*, 110 F.4th at 1291.

### 1.   *Alice* step one: abstract idea

At step one under *Alice*, I must consider "what the patent asserts to be the focus of the claimed advance over the prior art" by "focus[ing] on the language of the [a]sserted [c]laims themselves, considered in light of the specification." *Yu v. Apple Inc.*, 1 F.4th 1040, 1043 (Fed. Cir. 2021) (quotation omitted). This analysis "depends on an accurate characterization of what the claims require and of what the patent asserts to be the claimed advance." *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1294 (Fed. Cir. 2020). Thus, Courts must "tread carefully" when it comes to determining whether a patent claims an abstract idea, *Alice*, 573 U.S. at 217, lest they "describ[e] the claims at such a high level of abstraction and untethered from the language of the claims" such that the exceptions to Section 101 would swallow the rule. *Contour IP Holding LLC v. GoPro, Inc.*, 113 F.4th 1373, 1380 (Fed. Cir. 2024) (quotation omitted).

Claim 10's focus is narrower than Kobie describes. Certainly, Claim 10 is directed to sending, storing, receiving, and using data to provide incentives to website visitors, but Kobie ignores the claimed advance over the prior art, which is the use of an incentive application to award the incentives. This element appears throughout Claim 10, and the specification makes clear that the incentive application is an important part of the claimed

advance. Indeed, the specification touts the ability to offer incentives to website visitors using "an incentive application that is both portable and customizable[,]" obviating the need for website owners to develop specific incentive software programs for their websites. ('764 Patent at 1:36-37.) Thus, Claim 10 is directed to using an incentive application to award incentives to website visitors.

The next question is whether Claim 10 "focus[es] on 'the specific asserted improvement in computer capabilities … or, instead, on a process that qualifies as an abstract idea for which computers are invoked merely as a tool.'" *Recentive*, 134 F.4th at 1212 (quotation omitted). In this case, the focus is on the process of providing incentives on a website, using an incentive application with computers and network components as tools. But providing incentives to customers is an abstract idea that existed long before the internet. Indeed, offering incentives is a form of marketing, which is "a fundamental economic practice long prevalent in our system of commerce[.]" *Alice*, 573 U.S. at 134 (quotation omitted).

While courts must analyze patent eligibility "on a case-by-case basis," "prior cases can be helpful" for determining whether an idea is abstract. *CosmoKey Sols. GmbH & Co. KG v. Duo Sec. LLC*, 15 F.4th 1091, 1099 (Fed. Cir. 2021). That is true here. Indeed, two other courts have determined that "the basic concept of an incentive award system is, beyond doubt, an abstract idea, and implementing that idea on computers does not change its nature." *Kroy IP Holdings, LLC v. Safeway, Inc.*, 107 F. Supp. 3d 677, 696 (E.D.

10

Tex. 2015) (Bryson, J., sitting by designation), *aff'd*, 639 F. App'x 637 (Fed. Cir. 2016); *see also Kroy IP Holdings, LLC v. Groupon Inc.*, Defendant., No. 17-cv-1405, 2018 WL 6499675, at *8 (D. Del. Dec. 10, 2018)

The Federal Circuit has found software and computer networking claims to be directed to eligible subject matter where (1) "the focus of the claimed advance is on a solution to 'a problem specifically arising in the realm of computer networks' or computers," and (2) the claim identifies "a 'specific' improvement in computer capabilities or network functionality, rather than only claiming a desirable result or function[.]'" *TecSec*, 978 F.3d at 1293 (quotations omitted). As an initial matter, it is not clear to me that "website operators being required to invest the resources to develop their own incentive programs" is a problem unique to the internet, as BI Worldwide contends. (D.I. 14 at 15.) Like website operators, brick-and-mortar business owners also had to invest resources to develop incentive programs for their businesses, either by doing it themselves or hiring a third-party. This ranges from the relatively unsophisticated punch cards at a coffee shop to more elaborate loyalty programs at casinos. That is an economic problem, not a technical one.

But even if this is a technical problem unique to websites, Claim 10 is still not patent eligible for the same reasons the claims failed in *Groupon*. Like those claims, "[a]lthough some problems with prior computer-based incentive award systems are detailed, the claimed advance is not described as any specific improvement to the *technology* used to

11

implement those prior systems. There is no discussion ... of how the invention improves the functioning of any technology. Instead, the claimed invention is touted as a more ... convenient incentive award program that is simply provided by computers." *Groupon*, 2018 WL 6499675 at *7 (emphasis added). The same is true in this case.

At most, the claimed invention of using an incentive application to award incentives to website visitors is a more cost-efficient or convenient way for website operators to offer incentive programs on their sites. Neither the claim language nor the specification identifies an improvement in computer functionality or "enables a computer ... to do things it could not do before." *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1305 (Fed. Cir. 2018). For instance, Claim 10 "do[es] not call for any new hardware" or "call for any improvement in ordinary computer (here, server) functions, such as receiving, storing, processing, outputting, and transmitting." *GoTV Streaming, LLC v. Netflix, Inc.*, 166 F.4th 1053, 1065–66 (Fed. Cir. 2026). Nor does Claim 10 "fundamentally change[] or improve[] *how* a computer functions." *United Servs. Auto. Ass'n v. PNC Bank N.A.*, 139 F.4th 1332, 1339 (Fed. Cir. 2025) (original emphasis).

The alleged improvement that allowed incentive applications to be portable and customizable is not a technological improvement, no matter how many times BI Worldwide characterizes it as such. BI Worldwide contends that the incentive application is "portable" because it "is embedded into two separate websites and ... the information from those websites is sent to the network site for analysis." (D.I. 14 at 17.) But websites

sending information to a network site is standard computing behavior. To the extent BI Worldwide contends that the embedding aspect of the claim is a technological improvement, it has failed to explain how, and neither the claim language nor the specification makes that clear. Likewise, the ability to customize incentive programs is not a technological improvement either. As the specification acknowledges, website owners already had the ability to customize such programs by creating their own software. That the alleged invention makes customization easier or more cost-efficient is not a fundamental change to how a computer functions. Thus, the cases that BI Worldwide relies on are inapposite, where the claims in those cases were directed to technological improvements.[7]

Finally, the fact that the USPTO determined the '764 Patent and the other Patents-In-Suit to be patent eligible under Section 101 is not dispositive. "[A] patent examiner's consideration of Section 101 issues does not 'in any way shield the patent's claims from Article III review for patent eligibility.'" *Beteiro, LLC v. DraftKings Inc.*, 104 F.4th 1350, 1359 (Fed. Cir. 2024) (quotation omitted).

---

[7]    In *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1301 (Fed. Cir. 2016), the claim depended on specific architecture that provided a technological solution to a technological problem, and in *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016), the patent described "how its particular arrangement of elements is a technical improvement over prior art ways of filtering such content."

### 2.    *Alice* **step two: inventive concept**

Having determined that Claim 10 is directed to an abstract idea, I turn to the second step of the *Alice* inquiry, which requires me to "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application.'" *Alice*, 573 U.S. at 217 (quotation omitted). This is the search for an inventive concept, which is something "sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Id.* at 218 (same). For the claim to survive, "an inventive concept must be evident in the claims." *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1327 (Fed. Cir. 2017).

In computer-implemented inventions like the Patents-In-Suit, "the computer must perform more than 'well-understood, routine, conventional activities previously known to the industry.'" *CosmoKey*, 15 F.4th at 1097 (quotation omitted). But nothing in Claim 10 "requires anything other than conventional computer and network components operating according to their ordinary functions." *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1339 (Fed. Cir. 2017) (citation omitted). Indeed, Claim 10 recites generic computer components—*i.e.*, an application, a network site, websites, and computer systems—performing routine functions—*i.e.*, receiving, storing, and processing data about users and displaying additional information to them. And BI Worldwide does not suggest otherwise.

Instead, BI Worldwide contends that Claim 10 is inventive because it arranges "the various components … in a way that was not conventional." (D.I. 14 at 18.) BI Worldwide describes the ordered combination,[8] but it never explains what makes the alleged arrangement unconventional. To the extent BI Worldwide contends that the arrangement is unconventional because it is different than the prior method of offering incentives (*i.e.*, by developing website-specific software), that argument fails. "[A] claim for a *new* abstract idea is still an abstract idea." *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1151 (Fed. Cir. 2016) (original emphasis). Such claims are ineligible regardless of whether "the techniques claimed are '[g]roundbreaking, innovative, or even brilliant[.]'" *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1163 (Fed. Cir. 2018). And even if the '421 Patent claims a "unique arrangement" of APIs, that is not enough to render Claim 10 of the '764 Patent inventive.[9]

---

[8]    BI Worldwide contends that "the inventive concept is the ordered combination of a network site providing an embeddable incentive application to multiple websites, each of which may easily customize the incentive application to their needs; providing a centralized resource to receive, store, and process data of website viewer activity; and distributed delivery of incentive information through the embedded application(s)." (D.I. 14 at 16.)

[9]    To the extent BI Worldwide contends that Claim 10's distributed arrangement is novel (*see* D.I. 14 at 17), any alleged novelty has no bearing on whether the claim is inventive. Indeed, "[t]he search for a § 101 inventive concept is … distinct from demonstrating § 102 novelty." *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1151 (Fed. Cir. 2016). Thus, "even if [Claim 10] recites novel subject matter, that fact is insufficient by itself to confer eligibility." *Yu*, 1 F.4th at 1045.

Finally, whether Claim 10 captures the concepts of portability and customizability is of no moment because I have determined that these alleged advantages are not technological improvements.[10] Thus, BI Worldwide's reliance on cases like *Bascom* and *Amdocs* remains inapposite, as the ordered combination of elements in those cases led to technological improvements, whereas Claim 10 does not.

## IV.   CONCLUSION

Claim 10 of the '764 Patent is invalid because it is abstract and non-inventive. And because Claim 10 is representative of the claims remaining claims of the '764 Patent and the '339 Patent, those claims are patent ineligible as well. Thus, I will grant Kobie's motion to dismiss BI Worldwide's infringement claims based on those two patents.[11] An appropriate Order follows.

**BY THE COURT:**

*/s/ Joshua D. Wolson*

June 3, 2026                          JOSHUA D. WOLSON, J.

---

[10]   Likewise, during patent prosecution for the '339 Patent, the applicant described improvements in terms of cost and efficiency (rather than computer functionality). (*See, e.g.*, D.I. 14-1 at Page 223 of 275; Page 231 of 275.

[11]   BI Worldwide contends that "the Court should grant [it] leave to amend its complaint to add supporting factual allegations" as to the non-routine and unconventional nature of the claims. (D.I. 14 at 20.) In the Third Circuit, however, "a 'bare request in an opposition to a motion to dismiss—without any indication of the particular grounds on which amendment is sought … does not constitute a motion within the contemplation of Rule 15(a).'" *U.S. ex rel. Zizic v. Q2Administrators, LLC*, 728 F.3d 228, 243 (3d Cir. 2013) (quotation omitted). Even if its passing request were sufficient, BI Worldwide's failure to attach a draft amended complaint "is fatal to a request for leave to amend." *Id.* (same).